Caroline K. Simon, J.
The New York State Psychiatric Institute, located in the upper West Side of Manhattan, is a hospital facility owned and operated by the New York State Department of Mental Hygiene. It is located in a large building used for research and teaching in the field of psychiatry. The building contains a variety of functional rooms and equipment including laboratories.
On July 8,1966 at about 1:30 p.m. Mr. Vallelonga, a New York City Sanitation Department employee, then in his late thirties, was assigned to a garbage truck as part of a crew of three men. He testified that twice a week the truck would back up to the loading platform of the Institute’s garage entrance pre *242 paratory to emptying its cans of refuse into the loading hopper at the rear of the truck. He had been going to the Institute twice a week for about five years before the accident date.
As he lifted one of the galvanized cans in the usual way, wearing the leather gloves required by departmental rules, claimant testified that a gallon bottle labeled “ Sulphuric Acid ” fell from the top of the can and dropped to the floor. Mr. Vallelonga stated that he felt a burning sensation in his left arm and leg. He dropped the can of refuse, bent down to take off Ms shoe and noticed that his pants were going “ up in smoke ”, His fellow workers carried him into the building to a sink where running water was applied to the areas of contact. A doctor was called and he was taken to Presbyterian Hospital for treatment.
A claim for damages resulting from these injuries was timely filed with the Clerk of the Court of Claims and in the office of the Attorney-General. It alleges negligence of the employees of the Institute as the cause of the injuries and seeks $25,000 in damages for pain and suffering, disability, medical expenses and loss of services. The claim was neither assigned nor brought before another tribunal.
One of the sanitation team working with claimant heard the crash and ran to claimant’s assistance. He testified at the trial to seeing claimant’s pants smoldering and that he picked up the gallon-size plastic bottle with ‘1 Sulphuric Acid ’ ’ marked on the label. The bottle was placed in a box for safekeeping at the garage. Claimant testified that it remained there for about a year and then, when claimant 1 ‘ looked for it, it was gone ”. It was not produced at the trial, its present whereabouts being stated to be unknown.
In an examination before trial, an employee of the Institute who had worked there for 19 years as a power plant helper in the incinerator department, stated that his duties included collecting refuse packed in boxes and bringing it down to the basement to burn it in the incinerator. He explained that “ wet garbage ” included food from the kitchen and jars and bottles from the medical and laboratory areas. Such material is set aside and either wrapped in paper bundles if small, or, if large sized, dumped into large garbage cans. The “wet” garbage is not brought to the incinerator but is taken in cans to the disposal area to await the arrival of the city’s garbage trucks.
He stated that the rules and regulations were interpreted at regular montMy staff meetings. The regulations require that the bottles and jars that cannot be wrapped be placed separately *243 in large cans which are left open so that the material can be seen. He added that he never had observed acid left in bottles in these cans. His duties included washing out the empty garbage cans.
In another examination before trial, a stationary engineer also employed by the Institute and in complete charge of maintenance there, confirmed that regular meetings of his personnel took place either once a month or once in two months to discuss procedures. He explained that the building had either two or three laboratories, and that each was equipped with an “ acid line ”, which he described as a pipe made of ‘ ‘ duron ’ ’ which he said was impervious to acid. He said these acid lines had been installed years ago, and were in good condition at the time of the accident. The lines led directly to the main sewers and were built expressly for handling acid refuse.
Although he knew of no written regulations, he felt certain that they must have been in existence, and knew that it was an unwritten law of the Institute not to dispose of acids in any other manner than by use of the acid lines, and that this procedure had often been stressed at the regular staff meetings he conducted. He said that he would inspect the street-level garbage storage area whenever special items such as mattresses were set out for pickup, but that he did not inspect that area on a regular basis, nor did he recall inspecting the area immediately preceding the date of the accident. It was stipulated at the trial that wet garbage was stored within the Institute building and behind the building’s doors.
The rules of the State Hospital Code expressly require that “ Hospital systems shall be operated so that all sewage and other liquid wastes are disposed of by connection to a public sewer system or by an alternate method, in either event, as approved by the department.” (10 NYCRR 702.2 [b].) In the instant matter the acid line was the method in use.
In a stipulation entered into by the parties on January 31, 1968 and introduced as claimant’s Exhibit 9, Mr. Vallelonga’s injuries were established to be as follows: ‘1 Third degree burn of left lower calf, with permanent scar but with no limitation of motion or use. First degree burn of left fingertips and wrist, healed. Second degree burn of left forearm, healed.” It was also stipulated that the reasonable value of the hospital services to claimant was $91.90 and that his period of disability extended from July 8 to August 3, 1966.
Claimant testified that he visited his own physician at least twice a week during the five weeks he was unable to work. He
*244 said the blisters on his hand and fingers healed and disappeared, although he still experiences some pain there, as well as in the scarred area of his leg. The court observed the leg scar which is approximately 3% inches long and % of an inch wide and is in an area covered when wearing street clothes.
Under section 8 of the Court of Claims Act the State has waived its immunity from liability for the acts and omissions of its employees. In the operation and maintenance of its institutions the State is responsible only for hazards reasonably to be foreseen and for risks reasonably to be perceived. (See Flaherty v. State of New York, 296 N. Y. 342.)
For claimant to prevail, it must be shown that the State owed him a nondelegable duty to operate, maintain and control its premises by procedures which were adopted and carried out with reasonable care and diligence so as to provide a safe condition of the area to which he was invited to perform his tasks. Those who enter premises upon business which concerns the occupier, and upon his invitation, express or implied, are owed an affirmative duty to protect them, not only against dangers of which he knows, but also against those which with reasonable care he might discover. This has long been the rule in New York in conformity with the ancient English common law. (See Prosser, Torts [2d ed.], p. 453.)
Recent study of the role of and duties owed to an invitee omits all references to invitees, but first distinguishes between trespassers and licensees. The American Law Institute separates the latter category into ‘ ‘ gratuitous licensees ’ ’ and “ business visitors”. (See 3 Warren’s Negligence, pp. 204-205.) The business visitor is further defined as “ a person who is invited or permitted to enter or remain on land in the possession of another for a purpose directly or indirectly connected with business dealings between them.” (2 Restatement, Torts, § 332.)
The court is satisfied that Mr. Vallelonga’s presence on the premises was directly connected with duties that were being performed as an essential service useful to the Institute and appropriate to its operation. Failure to perform these duties would affect the smooth and orderly functioning of the Institute.
Having established the propriety of Mr. Vallelonga’s presence on the premises, the court then considers the instrumentality through which his injuries were sustained. Testimony was adduced to confirm the existence of laboratories for research and training, and that acids were used in these laboratories, and that acid lines had been installed for the safe disposal of acid wastes.
*245 Since the Institute was so equipped, it would be reasonable to assume that the containers used for the so-called “ wet garbage ’ ’ did not contain corrosive acids in containers placed therein. The court therefore does not find claimant, or any other such invitee, had a duty to examine the top surface contents of each garbage can for dangerous items before lifting or loading it into the truck hopper.
Under these circumstances, the court finds that unknown members of the staff of the Institute had been negligent in placing, allowing or permitting a jar containing sulphuric acid to be placed with the wet garbage contrary to the rules as interpreted in maintenance conferences, that this negligence was the competent producing cause of the injuries sustained by claimant, and was a breach of its duty to an invitee, and that Mr. Vallelonga was not contributorily negligent.
The State’s objection that liability could not be found since there was no proof of notice to the State is contradicted by the fact the State had rules relating to the handling of acid refuse and therefore under the circumstances at bar constructive notice can be inferred. (See 42 N. Y. Jur., Notice and Notices, § 3, p. 382.) “ Constructive notice exists whenever
it is shown that reasonable diligence would have produced actual notice.” Daniels v. Gardner (146 N. Y. S. 2d 599, 604.) The presence of the bottle of sulphuric acid in the garbage can was a responsibility of the defendant and entirely within its control, and that is sufficient.
Fortunately, claimant’s permanent injuries were not serious. There is a small leg scar which does not impair Mr. Vallelonga’s ability to perform his duties as before, and which is concealed when regular street clothing is worn, and occasional pain, not great, in his fingertips and hand.
For all damages sustained by claimant, including pain and suffering, medical expenses and disability, the court awards the sum of $1,500. Though the claim included an item for loss of services the award does not include any damage for such loss, no proof having been adduced on that point.
The State’s motions to dismiss for failure to present a prima facie case and for failure to show freedom from contributory negligence, made at the conclusion of claimant’s case and renewed when the State rested after adducing no proof at the end of the trial, on which decision had been reserved, are now denied. The State’s additional motion to dismiss for failure to preponderate, also made at the end of the trial, and on which decision was reserved, is now also denied.